CENTRAL VICTORIA, INC., demandante y apelada, *v.* WILLIAM P. KRAMER, Jefe del Servicio Forestal Insular, demandado y apelante.

No. 5221.—*Sometido:* Mayo 10, 1932. *Resuelto:* Noviembre 28, 1933.

Hon. *Procurador General Benjamín Horton* (James R. Beverley en el alegato) y *M. Rodríguez Serra, Procurador General Auxiliar,* abogados del apelante; *Cayetano Coll y Cuchí,* abogado de la apelada.

El Juez Presidente Señor del Toro, emitió la opinión del tribunal.

La sentencia en este caso se dictó el 16 de mayo, 1928. Diez días después fué apelada.

El 20 de enero, 1930, el taquígrafo de la corte sentenciadora expidió, a los efectos del perfeccionamiento de la apelación, una certificación que dice:

"CERTIFICO:—Que la anterior es una transcripción fiel y exacta de la evidencia testifical presentada por las partes en este caso; y no de la documental por habérseme hecho entender por el Departamento de Justicia que será remitida original al Hon. Tribunal Supremo de Puerto Rico."

Ocho días más tarde, en enero 28, 1930, el Juez sentenciador autenticó la transcripción así:

"CERTIFICA: Que la precedente es una transcripción fiel y exacta de la evidencia oral presentada por las partes en el presente caso y de todos los procedimientos y actuaciones de esta Corte durante el juicio del presente caso; y que la misma ha sido aprobada por la Corte previa audiencia de ambas partes, las que no ofrecieron objeción alguna."

La transcripción quedó radicada en la Secretaría de esta Corte Suprema el 4 de febrero, 1930, acompañándose a la misma una certificación expedida el 3 de febrero, 1930, por el Secretario de la corte sentenciadora que comienza así:

"CERTIFICO: Que durante la vista del juicio oral de este caso, que tuvo lugar el día 13 de abril de 1928, se presentó, y fué admitida por la Corte, la siguiente PRUEBA DOCUMENTAL:

"POR LA DEMANDANTE: Exhibit No. 1. Escritura No. 52, otorgada en 3 de agosto de 1928, ante el Notario Gustavo Cruzado Silva, por Luis Rubert y Catala y su esposa doña Antonia Armstrong y Mayoral, y don Pedro Giusti y su esposa doña María Giusti a favor de Central Victoria, Inc., sobre compraventa e hipoteca."

Siguen describiéndose de igual modo los Exhibits 2 a 15 y 19 a 35 del demandante, sin hacerse referencia alguna a los Exhibits 16, 17 y 18. Continúa la descripción por el mismo estilo de los Exhibits A a I del demandado y termina el documento como sigue:

"Y, Certifico, asimismo, que todos los documentos antes relacionados son los que se acompañan con la presente certificación y forman parte de los autos del caso, la que expido a petición del Hon. Attorney General de Puerto Rico, para ser remitida al Hon. Tribunal Supremo, . . ."

La parte apelante formuló su alegato el 15 de mayo, 1930, y la parte apelada el suyo el 10 de febrero, 1931.

El 17 de febrero, 1931, se celebró la vista del recurso. Del acta de la misma levantada por el secretario consta lo que sigue:

"Informaron en contra y en pro de la sentencia los abogados M. Rodríguez Serra, Subprocurador General y C. Coll Cuchí; el primero fué autorizado para traer una certificación creditiva de la intervención del Juez de Distrito en cuanto a la elevación de pruebas documentales originales y se concedió a dicho fin un término de tres días e igual término se concedió al apelado para que establezca por escrito qué documentos originales no han sido elevados."

El 9 de marzo, 1931, se expidió por el juez sentenciador una certificación que dice:

"EL QUE SUSCRIBE, Juez de la Corte de Distrito de San Juan, CERTIFICA:

"Que el juicio de este caso fué celebrado ante el Juez suscribiente, quien dictó sentencia que ha sido apelada ante el Tribunal Supremo de Puerto Rico.

"Que a principios del año 1930 las partes litigantes presentaron al suscribiente una estipulación escrita, cuyo propósito, en substancia, era: que la prueba documental presentada durante el juicio por

ambas partes fuera remitida, tal como se presentó, o sea los documentos originales, al Tribunal Supremo, a los efectos de la apelación en vez de ser transcritos; y el propósito que se perseguía con la estipulación era, según ambas partes manifestaron al suscribiente, acelerar la sustanciación del recurso, toda vez que la extensión extraordinaria de los documentos admitidos y ofrecidos en el juicio, exigiría largo tiempo para la preparación de la transcripción de toda la evidencia, cosa que deseaban evitar. Que se ha hecho, por orden del suscribiente, una cuidadosa investigación en la oficina del Secretario de esta Corte con el objeto de encontrar el original de la estipulación entre ambas partes litigantes en este caso, sin resultado, por lo que se ha llegado a la conclusión de que dicho documento se ha extraviado. Que dicha estipulación fué aprobada por el Juez suscribiente, por creerla fundada en motivos razonables.

"CERTIFICA, además, que la descripción de la prueba documental, certificada por el Secretario Auxiliar de esta Corte, Sr. Pedro del Manzano, que fué elevada con los autos y transcripción de la evidencia al Tribunal Supremo, es una transcripción correcta de la prueba documental presentada, según puede comprobarse, leyendo la transcripción de la evidencia.

"CERTIFICA, además, que los documentos que se acompañan a la presente certificación corresponden a los Exhibits Nos. 16 y 17 del demandante que no fueron incluídos entre los enviados con la transcripción, no apareciendo en los autos el Exhibit No. 18, a pesar de habérsele buscado cuidadosamente.

"Y a petición de la parte demandada y a los fines de presentarla al Tribunal Supremo de Puerto Rico, expido la presente en San Juan de Puerto Rico, a los 9 días del mes de marzo de 1931. (Fdo.) C. Llauger Díaz, Juez de Distrito."

El 4 de marzo, 1932, se señaló una nueva vista para el 10 de mayo, 1932. El 10 de mayo sólo compareció la parte apelada por su abogado. Solicitó oralmente la desestimación del recurso por no haberse preparado la transcripción de los autos de acuerdo con la ley.

La certificación expedida por el taquígrafo y aprobada por el juez comprende toda la prueba oral que se produjo en el juicio. La prueba documental se presentó durante el examen de los testigos, y consta en la transcripción el momento preciso en que se iban presentando los documentos.

Hemos comparado dicha transcripción con la certificación

expedida por el secretario el 3 de febrero, 1930, y con la li-
brada por el juez el 9 de marzo, 1931, y está conforme con
ellas.   Sólo falta el documento No. 18 del demandante que fué
un plano levantado por su testigo agrimensor Aniceto Díaz.

██ Siendo ésa la forma en que los autos han sido ele-
vados, ¿ha puesto la parte apelante a esta corte en condiciones
de resolver el recurso establecido?

La Ley No. 70 de 1911 para enmendar los artículos 92, 123,
227 y 299 del Código de Enjuiciamiento Civil, prescribe que:
"Constituirá el récord de una apelación, la certificación que
librará el secretario del tribunal *a quo* o los abogados de las
partes, del legajo de la sentencia y de la notificación de la
apelación."

Sobre la parte del legajo de la sentencia que contiene las
alegaciones no hay cuestión en este caso.   Ha sido certificada
por el secretario.   Tampoco la hay con respecto a la prueba
testifical.   Ha sido certificada por el taquígrafo y aprobada
por el juez.   Es con respecto a la prueba documental que
surge la cuestión.

El artículo 299 tal como quedó enmendado por la dicha
Ley No. 70 dispone que: "Cuando sea necesario para una co-
rrecta inteligencia y resolución del asunto, que algún mapa,
documento original o *exhibit* de cualquier clase, que no sea
susceptible de reproducción por medio de copia, fotografía o
de otro modo, sea presentado al examen e inspección de la
Corte Suprema, se hará una descripción del mismo, y el se-
cretario de la corte *a quo,* después de autenticar dicho mapa
o documento original o *exhibit,* bajo su firma y sello de la
corte, remitirá el mismo al secretario de la Corte Suprema,
haciendo constar que se ha hecho parte del *record* del asunto."

La certificación que originalmente se acompañó a la trans-
cripción era manifiestamente insuficiente.   ¿Quedó perfeccio-
nada por la certificación expedida más tarde por el juez?

No hay duda alguna que los documentos consistentes en
planos pudieron enviarse originales de acuerdo con la ley,

pero el envío original de las escrituras y de las certificaciones expedidas por el registrador y el Comisionado del Interior no está justificado en modo alguno. Es una práctica no autorizada por la ley ni por los precedentes.

Sin embargo, como la autenticidad de los documentos ha quedado demostrada y como la misma parte que solicita ahora la desestimación estipuló que dichos documentos pudieran remitirse a la Corte Suprema en la forma en que lo han sido, nos inclinamos a ejercer nuestra discreción permitiendo que el recurso continúe, sin que esta resolución pueda invocarse en el futuro como un precedente a seguir.

Ahora bien, ¿qué efecto puede tener la falta del Exhibit 18? Dicho Exhibit es un plano que se presentó como complemento o resultado de la declaración de un testigo agrimensor, y según la opinión que del caso hemos formado su falta no dañará los intereses de la parte que lo presentara.

El pleito en su fondo versa sobre quién debe ocupar y disfrutar cierta porción de terreno que colinda al Norte con el canal de Suárez y al Oeste con la laguna de San José. Sostiene la demandante que dicha porción es parte de una finca que legítimamente le pertenece por título de compra, habiendo estado en posesión de la misma por sí y por sus causantes por espacio de más de treinta años sin interrupción de clase alguna hasta el momento en que el demandado penetró violentamente en ella cortando y vendiendo leña y oponiéndose al ejercicio del derecho dominical de la demandante. Y alega el demandado que la porción pertenece al Pueblo de Puerto Rico y que él está en posesión de la misma como jefe que es del Servicio Forestal. Alegó además que la corte carecía de jurisdicción porque El Pueblo era la verdadera parte interesada y no había prestado su consentimiento para ser demandado.

La cuestión jurisdiccional quedó resuelta en el sentido de que podía proseguirse el pleito contra el demandado (*Central Victoria* v. *Kramer,* 35 D.P.R. 183) y pesando la evidencia aportada por ambas partes en el acto del juicio, la Corte de-

cidió el pleito en favor de la demandante. En su relación del caso y opinión se expresó, en parte, así:

"De toda la prueba practicada, la Corte considera que se ha probado, que la demandante deriva su derecho a los terrenos que describe en su demanda, de un don José Suárez, que allá para el día 5 de octubre de 1875, era dueño de varias parcelas de terreno, según aparece de la extensa certificación expedida por el Registrador de la Propiedad de San Juan, Sección 2ª., y que creemos innecesario copiar en esta opinión. También considera la Corte probado, que estas parcelas de terreno de que aquí se hace mención y por virtud de sucesivas transacciones, fueron transmitidas, hasta llegar a poder de la corporación demandante, que tiene sus títulos inscritos en el Registro de la Propiedad; y que de acuerdo con toda la prueba, tanto oral como documental, la demandante ha estado siempre en el libre goce y la pacífica posesión de la finca que se describe en la demanda, sin haber sufrido interrupción de ninguna clase en su posesión."

Hemos estudiado cuidadosamente los autos y a nuestro juicio procede la confirmación de la sentencia apelada no ya por el mérito de las alegaciones y de la prueba de la parte demandante, si que por el de la evidencia aportada por la propia parte demandada.

No hay duda alguna de que la porción de tierra en disputa, que comprende cerca de trescientas cuerdas parte de mangle, parte de maraguey y parte de pastos, llegó a la propiedad y posesión de la demandante a virtud de sucesivas transferencias hechas constar en escrituras públicas inscritas en el Registro de la Propiedad figurando siempre en ellas las colindancias del canal y la laguna por el Norte y el Oeste respectivamente, verificándose la primera inscripción el 30 de mayo de 1881 a favor de José Suárez. Y tampoco la hay comparando las escrituras, los certificados de inscripción y los planos presentados por la parte demandante con el plano topográfico de los terrenos de Cangrejos Arriba de la propiedad de la Real Hacienda levantado en 1859 por el agrimensor José Antonio Calderón, con el plano levantado en 1864 por el propio Calderón de una porción de terreno baldío concedida a José Suárez, con el plano del lote No. 2 de los te-

rrenos del Hato de Cangrejos Arriba propiedad de José Suárez constante de más de cuatrocientas cuerdas levantado en 1873 por el agrimensor Juan Horta y con el expediente de la Inspección de Montes iniciado en junio de 1885, sobre averiguación de si pertenecen a don Bernardo Suárez unos manglares en la jurisdicción de Carolina—que constituyen los Exhibits F, G, H e I del demandado—que la porción de que se trata fué vendida por la Real Hacienda al primitivo causante de la demandante.

Del indicado expediente resulta que en junio 12, 1885, don Bernardo Suárez como representante legal de sus menores hijos habidos en su matrimonio con doña María de Jesús Urrutia, por su propio derecho y por encargo de don José Suárez y don Gaspar Bariola se dirigió al Gobernador General de la Isla exponiéndole:

"Que el último de los citados, Bariola, es dueño de unos terrenos que remató la Hacienda y adjudicó a D. José Suárez, quien los vendió a Da. Ma. de Jesús Urrutia y ésta al referido Bariola, compuesta del lote número dos del Hato de Cangrejos, los cuales tienen colindancia con la laguna de Cangrejos y Canal denominado de Hoyo Mulas, según consta de la escritura pública que en testimonio acompaña a calidad devolutiva por necesitarla para otras operaciones.

"Habiendo visto en la Alcaldía de la Carolina un anuncio para la subasta del aprovechamiento de los manglares por la inspección de Montes como quiera que han sido satisfechos al Estado los terrenos que los comprende, por cuya causa y la de que el citado Canal es obra del hombre y no de la naturaleza, no está comprendido en la Ley de aguas: acudo

"Suplicando se digne mandar, que se suspenda el remate mencionado, y se respete la propiedad particular, toda vez que vendida por la Hacienda Pública, corresponde su usufructo única y exclusivamente a sus legítimos dueños, que los hubieron de buena fe y han pagado y pagan por ellos sus contribuciones."

Mandado a investigar el asunto con inclusión de sus antecedentes, fué devuelto en agosto 11, 1885, al Gobernador General con un informe firmado por César de Guillerna del

Cuerpo Nacional de Ingenieros de Montes de la Inspección de Puerto Rico, que dice:

"En el expediente general de la venta del Hato de Cangrejos arriba, que ha sido remitido a esta Inspección para que pueda informar respecto a una reclamación formulada por D. Bernardo Suárez oponiéndose al arrendamiento de más manglares en la laguna de la 'Torrecilla' o Mata Redonda que dice que le corresponden por formar parte del lote No. 2 por él subastado a la Hacienda, resulta que si bien el anuncio de subasta de los diversos lotes en que se dividió para su enajenación el expresado Hato no se incluyeron los manglares al hacer la entrega de los mismos el encargado de medirlos incluyó en cada uno la parte de manglar que había contigua considerando lo escaso de cabida.

"Las oficinas de Hacienda aceptaron las operaciones del perito y dieron posesión de todo lo que éste había comprendido en sus operaciones con lo cual vendió sin previo acuerdo ni autorización los manglares que son playas según el título 1º. de la Ley de Aguas para realizar lo cual hubo de asignarse a la superficie de éstos un valor por unidad muy distinto al aceptado en la subasta.

"La venta de estos manglares por anómala que pueda aparecer en la forma que se llevó a cabo está hecha y de ella no son ni pueden ser responsables los que los han comprado de buena fe.

"Hay que lamentar que por haberse enajenado lo que con arreglo a la Ley de Aguas son playas y por tanto, del dominio nacional sin dar conocimiento ni a las autoridades de Marina ni a esta Inspección a cuyo cargo han estado o están los manglares se haya molestado a los interesados exigiéndoles la presentación de documentos y que se haya puesto en duda un derecho que tienen legítimamente adquirido.

"Como por anómalo que pueda ser la enajenación de los manglares que lindan con el Hato de Cangrejos arriba ésta resulta hecha por la Hacienda en nombre del Estado, esta Inspección tiene el honor de proponer a V. E. acuerde que la parte de manglar adquirida por el Sr. Suárez que linda con el lote No. 2 por él adquirida se excluya del inventario de los que pertenecen al Estado y que se suspenda la subasta del aprovechamiento de dicho manglar."

En agosto 18, 1885, el Gobernador General Dabán aprobó el informe, comunicándose a la Inspección de Montes lo que sigue:

"De orden del E. S. G. G. pongo en conote. de V. S. que con

esta fecha se ha trascrito a la Alcaldía de la Carolina como resolun. de este G/ el oficio de esa Inspn. No. 360 de fecha 11 del corrte., relativo a reconocer a D. Bernardo Suárez la propiedad de unos manglares de aquella jurisdic.''

Siendo ello así, no le es posible en los actuales momentos al sucesor de la Corona de España en el dominio de las tierras públicas de Puerto Rico disputar la propiedad de la porción de terreno en cuestión en este pleito, la mayor parte de la cual según la prueba no es ya manglar sino tierra aprovechada como pasto.

Podría levantarse alguna cuestión con respecto a la facultad del Gobernador General para ratificar la venta de lo que entonces era manglar, pero es lo cierto que aunque se concluyera que no la tenía, habría que reconocer que los causantes de la demandante habían ya adquirido un título por prescripción cuando se verificó el cambio de soberanía, constando como consta que entraron en la posesión como dueños a título de compra desde 1873. Véase la R. O. No. 469 de agosto 20, 1888, publicada en la Gaceta de Puerto Rico en octubre 11, 1888. *Fajardo Sugar Growers Ass'n.* v. *Kramer,* 45 D.P.R. 348, 365.

Bajo cualquier aspecto, pues, que el caso se considere es necesario reconocer que la razón está de parte de la demandante. *Procede en tal virtud la confirmación de la sentencia recurrida.*